### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| UNITEDHEALTHCARE OF FLORIDA, INC., UNITEDHEALTHCARE OF OHIO, INC., and ALL SAVERS INSURANCE COMPANY, | Case No. _____ |
| Plaintiffs, | |
| v. | **COMPLAINT** |
| AMERICAN RENAL ASSOCIATES HOLDINGS, INC., and AMERICAN RENAL ASSOCIATES LLC, | **JURY TRIAL DEMANDED** |
| Defendants. | |

Plaintiffs UnitedHealthcare of Florida, Inc. ("UHC of Florida"), UnitedHealthcare of Ohio, Inc. ("UHC of Ohio"), and All Savers Insurance Company ("ASI") (collectively referred to herein as "United"), in their Complaint against Defendants American Renal Associates Holdings, Inc. and American Renal Associates LLC (collectively "ARA") hereby state and allege as follows:

## NATURE OF THIS ACTION

1.      This action involves a fraudulent and illegal scheme by ARA – one of the country's largest providers of dialysis services – to unlawfully obtain benefit payments from United for dialysis services rendered to vulnerable patients suffering from chronic kidney disease.

2.      ARA has directed its deceptive conduct at United and United's commercial health insurance plans, and has caused United to make substantial payments to ARA that United would not have made had ARA acted truthfully and lawfully. ARA has preyed upon some of Florida's and Ohio's most vulnerable patients

– ones suffering from end-stage renal disease ("ESRD") – converting them from patients to pawns in a scheme to maximize ARA's profits.

3.      In fact, since the beginning of the year, ARA has systematically targeted these Medicaid- and Medicare-eligible patients and, through deception and unlawful means, has convinced them to drop or reject their affordable government insurance options and enroll in United's commercial plans.

4.      The lone motivating factor behind ARA's patient conversion efforts is ARA's desire to maximize its own profits.

5.      Medicaid and Medicare pay ARA a reimbursement rate of $300 or less for one session of dialysis services rendered to an ESRD patient (the Medicaid rates in Florida and Ohio are less than $200 for one session of dialysis services).

6.      ARA is an out-of-network provider, rather than an "in-network" provider, for United's commercial plans. This means ARA does not have a contractually agreed upon rate for dialysis services rendered to patients insured under those plans. As an out-of-network provider, ARA believes it can bill United at rates that are as much as twenty times the rates it would receive from Medicaid and/or Medicare. As described below, ARA's out-of-network status has made United's commercial plans a particularly attractive target for ARA's scheme.

7.      Knowing of its out-of-network status with United plans, and believing that it can bill United more than $4,000 *for the same services* being rendered to Medicaid- and Medicare-eligible ESRD patients, ARA has endeavored to cause those patients to drop their government insurance and enroll in United's commercial plans. For at least the past year, ARA has succeeded, causing many ESRD patients to move off of or away from Medicaid and/or Medicare and onto a commercial plan offered by United. ARA has then submitted charges to United seeking to be paid benefits for dialysis services rendered to those patients that exceed by a factor of more than twenty times the

reimbursement amount ARA would receive were it to bill certain government insurance plans for those services.

8.      To implement its scheme against United, ARA needed to overcome the financial limitations of the vulnerable patient population ARA wanted to use to increase its profits. Specifically, ARA needed to figure out how to convince ESRD patients (many of whom are indigent, and who, under their Medicaid and Medicare plans, had little to no personal financial responsibility for their medical and pharmaceutical benefits) to take on the premium, copay, coinsurance and deductible obligations associated with United commercial plans.

9.      The solution ARA implemented was deceptive, fraudulent, and illegal.

10.     *First*, ARA secured premium assistance from a third-party, the American Kidney Fund ("AKF"), to cover the patients' commercial plan premiums. Upon information and belief, AKF's financial assistance was funded by earmarked donations ARA made to the 501(c)(3) organization for this very purpose.

11.     *Second*, ARA counseled patients and assisted them with enrollment in the commercial plans that were most favorable to ARA—*i.e.*, plans that would result in the highest out-of-network reimbursement to ARA.

12.     *Third*, ARA illegally, and in violation of the language of the applicable commercial plans, waived the patients' copay, coinsurance and deductible obligations to ARA.

13.     Patients suffered in two ways as a result of ARA's scheme. *First*, upon information and belief, ARA intentionally failed to inform patients that AKF's premium assistance program was only available for patients receiving dialysis treatments and, consequently, none of the patients knew that they would be ineligible for premium assistance if they sought to cure their condition through a kidney transplant. *Second*, while *ARA* illegally agreed to waive the copays, coinsurance and deductibles patients owed to it, it could not guarantee that the patients' doctors, pharmacists, medical

equipment suppliers, and other service providers would similarly break the law by doing the same.

14.      ARA's actions violated several important criminal and civil laws, including Florida's prohibitions on false and fraudulent insurance claims (Fla. Stat. § 817.234), Florida's Patient Brokering Act (Fla. Stat. § 817.505), Florida's Anti-Kickback Statute (Fla. Stat. § 456.054), and Florida's Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201 *et seq.*) ("FDUTPA").

15.      Because ARA used unlawful means to move vulnerable ESRD patients onto commercial United plans, the services and treatments ARA provided to these patients after it implemented its scheme were not lawful when rendered and were, therefore, ineligible for reimbursement.

16.      United has already paid millions of dollars in benefits to ARA for claims ARA submitted as part of its illegal and unethical conversion and billing scheme.

17.      The chart attached hereto as Exhibit A identifies specific claims that ARA has submitted pursuant to the scheme described in this Complaint, and for which United has made payments. For each claim, Exhibit A identifies the amount of the claim, the date the claim was submitted, the procedure and associated revenue code associated with each claim, the date the claim was paid, and the amount that was paid. Each claim identified in Exhibit A relates to the provision of dialysis services. Exhibit A also anonymously identifies the members for whom ARA submitted the claims. Members 1-10 are Florida residents, while Members 11-27 are Ohio residents. Several members, including members 1, 2, 3, 5, 7, and 8 received dialysis services at ARA's Belle Glade facility, for which payments were made. Upon information and belief, additional information identifying other ESRD patients ARA targeted, converted, treated, and billed for pursuant to its illegal and deceptive scheme described herein is uniquely within ARA's possession at this time and should be available through discovery.

18.      ARA's unlawful conduct and scheme continues to this day.

19.     United brings this action to put a stop to the illegal, deceptive, and fraudulent efforts of ARA that jeopardize patient safety and have caused financial harm to United. Pursuant to 28 U.S.C. § 2201 and Fla. Stat § 501.211(1), United seeks a declaratory judgment that ARA is operating in violation of state law and that United is not liable for any pending or future claims submitted by ARA based on the conduct described herein. United also asserts a statutory claim under Fla. Stat. § 501.201 *et seq.* and common law claims for fraud, negligent misrepresentation, unjust enrichment, and civil conspiracy to recover, at a minimum, actual damages in the amount of benefits paid on the unlawful and fraudulent claims ARA has submitted, or caused to be submitted, to United pursuant to ARA's illegal scheme. Finally, United seeks an injunction to prevent ARA's conduct from continuing.

## PARTIES

20.     Plaintiff UnitedHealthcare of Florida, Inc. is a corporation organized under the laws of the State of Florida, with its principal place of business in the State of Florida. UnitedHealthcare of Florida, Inc. insures and administers plans that are offered in the State of Florida.

21.     Plaintiff UnitedHealthcare of Ohio, Inc. is a corporation organized under the laws of the State of Ohio, with its principal place of business in the State of Ohio. UnitedHealthcare of Ohio, Inc. insures and administers the Ohio Compass plan offered in the State of Ohio.

22.     Plaintiff All Savers Insurance Company is a corporation organized under the laws of the State of Indiana, with its principal place of business in the State of Indiana. All Savers Insurance Company insures and administers the Navigate Plus plan offered in the State of Ohio.

23.     Defendant American Renal Associates LLC is a company organized under the laws of the State of Delaware, with its principal place of business located in Beverly, Massachusetts. American Renal Associates LLC is 100% owned by American Renal

Holdings, Inc., a corporation organized under the laws of the State of Delaware, with its principal place of business located in Beverly, Massachusetts. American Renal Associates LLC owns and operates free-standing dialysis centers throughout the country. American Renal Associates LLC operates thirty nine dialysis centers in the State of Florida, including centers located in the cities of Clewiston and Belle Glade. American Renal Associates LLC operates sixteen dialysis centers in the State of Ohio, including centers located in the cities of Warren and Youngstown.

24.     Defendant American Renal Associates Holdings, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business located in Beverly, Massachusetts. American Renal Associates Holdings, Inc. is the ultimate parent company of American Renal Associates LLC.

**JURISDICTION AND VENUE**

25.     This court has personal jurisdiction over Defendants in this action because Defendants own and operate dialysis centers in this district and regularly transact business in this district. Moreover, many activities giving rise to this action have taken place through contacts and communications in and into this district. Personal jurisdiction is proper before this Court pursuant to Fla. Stat. § 48.193(1)(a)(1) and (2) because Defendants operate, conduct, engage in, and carry on business in Florida, and have committed a tortious act within this state targeted towards Florida businesses and residents. Personal jurisdiction is also proper before this Court pursuant to Fla Stat. § 48.193(2) because Defendants engage in substantial and not isolated activity within Florida.

26.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different states.

27.     Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims in this

action have occurred in the Southern District of Florida. Many individuals who are part of UHC of Florida's insurance plans and many ARA facilities related to this action are located in this district, and many activities giving rise to this action have taken place through ARA's contacts and communications in this district. UHC of Florida has also made certain commercial plans at issue in this case available in this district at all relevant times by offering them through Florida's health insurance exchange.

## FACTUAL BACKGROUND

### Treatment of Chronic Kidney Disease

28.     The kidneys play a critical role in the body's effort to excrete waste produced by metabolism. Kidneys filter blood and remove water-soluble wastes, such as urea and ammonium. Every day, the kidneys filter about 200 quarts of blood to produce about 1 to 2 quarts of urine, which is composed of wastes and extra fluid.

29.     The kidneys are important because they keep the composition of the blood stable, which lets the body function properly. Among other things, they prevent the buildup of wastes and extra fluid in the body and maintain stable levels of electrolytes, such as sodium, potassium, and phosphate.

30.     Chronic kidney disease ("CKD") is a condition characterized by a gradual loss of kidney function over time. There are five stages of CKD, which generally track the functionality of the kidneys. When kidney function drops to 10–15% of normal capacity, a patient is said to be in stage five of CKD. This stage is also referred to as end-stage renal disease, or ESRD, and is an irreversible condition.

31.     Patients with ESRD are commonly treated with dialysis, which is a process for removing waste and excess water from the blood. ESRD patients typically receive dialysis treatments three times per week for the rest of their lives.  Importantly, dialysis does not correct the compromised functions of the kidneys—it simply replaces

some of the kidneys' functions through diffusion (waste removal) and ultrafiltration (fluid removal). The only way to cure ESRD is by a kidney transplant.

## Insurance Coverage of Dialysis Services

### Medicaid Coverage

32.     Many patients with ESRD qualify to receive health insurance through Medicaid. Medicaid is a social health care program for families and individuals with low income and limited resources that was created by amendments to Title XIX to the Social Security Act, 42 U.S.C. §§ 1396 *et seq*. Medicaid is a means-tested program that is jointly funded by the state and federal governments and managed by the states. Under the program, the federal government provides matching funds to states to enable them to provide medical assistance to residents who meet certain eligibility requirements.

33.     Florida's Agency for Health Care Administration administers the Florida Medicaid program. Patients enrolled in Florida's Medicaid program pay a copay of $1 to $3 depending on the services being rendered.

34.     Ohio's Department of Medicaid administers the Ohio Medicaid program. Patients enrolled in Ohio's Medicaid program pay a $3 copay per visit.

35.     Upon information and belief, many patients were insured by the Medicaid program before ARA counseled them to drop that coverage and switch to a United plan, as described herein.

### Medicare Coverage

36.     Qualifying citizens with ESRD may also be eligible to enroll in Medicare Parts A and B. Medicare coverage of dialysis services commences three months after enrollment.

37.     Section 153(b) of the Medicare Improvements for Patients and Providers Act of 2008 amended the Social Security Act to require the Centers for Medicare & Medicaid Services ("CMS") to implement a fully bundled Prospective Payment System ("PPS") for renal dialysis services furnished to Medicare beneficiaries for the treatment

of ESRD effective January 1, 2011. The bundled payment under the ESRD PPS includes all renal dialysis services furnished for outpatient maintenance dialysis, including drugs and biologicals (with the exception of oral-only ESRD drugs until 2024 as required by section 217(a)(1) of the Protecting Access to Medicare Act of 2014) and other renal dialysis items and services that were formerly separately payable under the previous payment methodologies. The bundled payment rate is case-mix adjusted for a number of factors relating to patient characteristics. There are also additional adjustments for ESRD facilities that have a low patient volume, and for facilities that offer home dialysis training.  For high-cost patients, an ESRD facility may be eligible for outlier payments.

38.     The Medicare Part B premium for most enrollees in 2015 was $104.90 per month and the annual deductible that year was $147. Medicare enrollees are also responsible for a copay amounting to 20% of the Medicare fee schedule. CMS has set a base reimbursement rate of $230.39 per dialysis treatment for renal dialysis services provided in 2016.

39.     Upon information and belief, many of the patients ARA counseled into dropping Medicaid coverage and switching to a United commercial plan, as described herein, were also eligible for Medicare coverage at the time they were enrolled in the United plans by ARA employees.

***Private Commercial Insurance Coverage***

40.     Patients with ESRD may also seek coverage from private commercial insurance plans. These plans often differ in terms of the services they cover, the facilities and providers they consider to be in-network, the premiums they charge, and the costs they require patients to bear in the form of premiums, coinsurance, copays, and deductibles. Individuals who are part of United's plans are known as "members."

41.     The Patient Protection and Affordable Care Act (the "ACA") created exchanges run by states and the federal government that are market forums where insurance companies offer various health insurance plans for individuals to compare

and purchase for themselves or their families. The plans offered in the exchanges are called Qualified Health Plans and must meet certain requirements in terms of the benefits they offer, as required by the Affordable Care Act.

42.     United's Gold Compass 1500 plan is offered in Florida through Florida's health insurance exchange. United's Compass and Navigate Plus plans are offered in Ohio through Ohio's exchange.

43.     As a means of controlling costs to their members and improving quality of care, most commercial insurers, including United, create provider networks for their plans. Providers who join a network enjoy the benefit of increased volume, as plan members are financially incentivized to seek medical treatment from in-network providers. United has contractual relationships with in-network providers that set reimbursement rates for provision of particular services. The reimbursement rates agreed to by in-network providers are generally significantly lower than the reimbursement rates charged by out-of-network providers, or those that do not have a contractual relationship with United.

44.     Plan members are also incentivized by many factors to seek treatment from in-network facilities, including the fact that when members receive treatment from in-network facilities, their commercial plans generally cover a greater share of the relevant financial obligations and the members' personal exposure is generally lower than if they were to receive treatment from an out-of-network facility. When members choose to receive treatment from an out-of-network facility, they run the risk of ending up with total financial responsibility for the cost of that treatment, or, at least, having to pay significantly higher amounts for coinsurance or other cost-sharing obligations.

45.      UHC of Florida's Gold Compass 1500 plan, to which many of ARA's Florida patients subscribed at ARA's direction, does not provide guaranteed out-of-network benefits to its plan members.

46.     Generally, in order for a plan member to receive treatment or services from an out-of-network provider, that member must request and obtain permission in advance from the plan to honor the member's in-network benefits, even though they are seeing an out-of-network provider.

47.     At all times relevant to this action, ARA has been an out-of-network provider for the various commercial plans offered by United, including the Gold Compass 1500, Compass, and Navigate Plus plans to which ARA has been causing ESRD patients to switch.

### The American Kidney Fund and Its HIPP Program

48.     AKF is registered as a tax-exempt, non-profit organization under Section 501(c)(3) of the Internal Revenue Code. 26 U.S.C. §501(c)(3). AKF is based in Rockville, Maryland.

49.     According to its website, AKF's mission is to "help people fight kidney disease and live healthier lives," which it claims to accomplish "by providing financial support to patients in need, and by delivering programs that educate, build awareness, and drive advocacy, resulting in greater public understanding and ultimately the prevention of kidney disease." (http://www.kidneyfund.org/about-us/mission/).

50.     Through its Health Insurance Premium Payment ("HIPP") program, AKF pays premiums for dialysis patients with qualifying financial needs.

51.     According to AKF, "HIPP is a 'last resort' source of assistance to dialysis patients. It is restricted to patients who have no means of paying health insurance premiums and who would forego coverage without the benefit of HIPP." (http://www.kidneyfund.org/patient-programs/hipp/qualifying-for-hipp.html). In other words, dialysis patients who are covered by a third-party insurer—*e.g.*, Medicaid or Medicare—or who could be covered by a third-party insurer absent AKF's assistance, are not eligible for HIPP funds to pay for alternative coverage.

52.     Astonishingly, the HIPP program will not support patients who choose to pursue a kidney transplant—*the only cure for CKD*. Rather, the HIPP program will only support patients who choose to continue with lifelong dialysis services. The HIPP program is primarily supported by donations from third party dialysis providers, including ARA.

**ARA's Scheme**

***ARA has moved ESRD patients onto UHC of Florida plans in Florida by waiving patient cost-sharing responsibilities and using AKF to pay patient premiums***

53.     ARA provides dialysis services to Florida residents suffering from ESRD through the dozens of dialysis centers that it owns and operates across the State, including centers located in the cities of Clewiston and Belle Glade.

54.     ARA is reimbursed for its services through a combination of payments received from its patients' insurance plans and from the patients themselves in the form of the deductible, copay, and coinsurance obligations required by each patient's respective insurance plan.

55.     Although the *services* that ARA provides to a patient do not vary depending on the patient's insurance plan, the *reimbursement* or "benefit" payment that ARA receives from the patient's insurer for those services varies greatly depending on the patient's coverage. For example, if patients are covered by Medicaid, ARA would receive the State Medicaid reimbursement rate, which on average amounts to under $200 per visit for dialysis treatments in Florida. But if patients are covered by a private, out-of-network commercial plan, ARA receives the out-of-network reimbursement rate for the same services, which can amount to several thousand dollars and can exceed the Medicaid reimbursement rate by a factor of twenty or more.

56.     Tempted by these economics, ARA embarked on a scheme designed to extract the higher reimbursement rates from UHC of Florida and increase its profits, using deceptive, fraudulent, and unlawful means to enroll ESRD patients in certain

12

targeted UHC of Florida plans and then bill UHC of Florida for out-of-network benefits payments.

57.     Specifically, ARA endeavored to cause ESRD patients to drop or move away from government insurance and convert to UHC of Florida's Gold Compass 1500 plan – a private commercial plan UHC of Florida offered in Florida through the State's federally facilitated exchange.

58.     As ARA knew, or should have known, the patients it targeted for conversion – ones who had qualified for publicly-funded insurance based on their respective ages, medical conditions and/or incomes – could not afford the additional financial obligations (in the form of premiums, coinsurance, copays, and deductibles) associated with UHC of Florida's commercial plans. Indeed, these financial responsibilities were either not owed or were substantially less under the patients' existing Medicaid and/or Medicare coverage options.

59.     Nor would these patients have any meaningful incentive to enroll in the UHC of Florida plans, as their dialysis treatment would have been covered by the government plans at virtually no cost to them.

60.     Accordingly, for the scheme to work, ARA knew that it needed to eliminate these financial burdens. To do so, ARA implemented a multifaceted scheme that defrauded UHC of Florida, violated various federal and state laws, and treated ARA patients as pawns.

61.     The first pillar of the scheme was designed to address the premium payment issue. To that end, ARA coordinated with AKF to do what ARA could not do itself – pay its patients' premiums. ARA controlled every step in the relationship with AKF. ARA introduced the HIPP program to patients in ARA clinics; provided them with the requisite application for assistance; assisted the patients in filling out that application; and submitted the application on behalf of the patients. Many patients would then bring bills they received for premium obligations into the ARA clinic and

13

ARA would ensure that the premiums were paid for by AKF. Other patients were instructed that AKF would send premium assistance checks directly to them so that they could make the premium payments in order to avoid detection by insurance plans that did not accept third-party premium payments.

62.     Not surprisingly, payment of patient insurance premiums by third parties has been a concern on which the Department of Health and Human Services ("HHS") has focused for years—counseling insurers to reject such payments because of the overall impact they have on the cost of healthcare.

63.     For example, in a November 4, 2013 FAQ, the HHS Secretary explained:

> HHS has significant concerns with this practice because it could skew the insurance risk pool and create an unlevel field in the Marketplaces. HHS discourages this practice and encourages issuers to reject such third party payments.

64.     And in a May 30, 2014, Supplemental Special Advisory Bulletin, the OIG emphasized that:

> A charity with narrowly defined disease funds may be subject to scrutiny if the disease funds result in funding exclusively or primarily the products of donors or if other facts and circumstances suggest that the disease fund is operated to induce the purchase of donors products.

65.     Consistent with HHS guidance, the United commercial plans at issue required members to make their own premium payments.

66.     More recently, states have started recognizing that insurers need not accept premium payments or other cost-sharing payments from third party charities like AKF that receive funding from entities with a pecuniary interest in the payment of health insurance claims. For example, in an Administrative Bulletin dated June 23, 2016, the Minnesota Departments of Commerce and Health referred to such entities as "ineligible third parties," made it clear that "[p]remium payments to carriers" from those "ineligible third parties" are "not required to be accepted," and stated that

14

"[s]imilarly, carriers are not required to accept and count cost-sharing paid by ineligible third parties toward the deductible or out-of-pocket maximum."

67.     AKF and, upon information and belief, ARA knew or should have known that the terms of the United commercial plans to which ARA endeavored to steer ESRD patients did not permit AKF or ARA to make premium payments for United plan members, or to contribute to or reimburse those members for their premium payments.

68.     Nonetheless, ARA counseled patients to enroll in the UHC of Florida plans and arranged for prohibited third-party payments of member premiums to be made.

69.     The second pillar of the Medicaid-to-commercial conversion scheme addressed ARA's desire to maximize reimbursement. To this end, upon information and belief, ARA identified the UHC of Florida plans that would pay the highest reimbursement and counseled its patients into *those* plans without regard to whether the plans were suited to the patients' medical needs or economic status.

70.     Upon information and belief, one or more employees in ARA's financial office arranged for ARA's ESRD patients to change their insurance coverage to UHC of Florida's private out-of-network plans and filled out and submitted the patients' HIPP applications to AKF.

71.     The third pillar of the ARA scheme solved the copay/coinsurance/ deductible problem: ARA systematically and routinely waived those obligations for patients who complied with its request to enroll in the UHC of Florida plans. This was not done to ease an otherwise unavoidable financial burden for these patients—indeed, it was a burden that *ARA had created*. Rather, the strategic decision to waive the cost-sharing obligations owed was one of simple math: the money that ARA forewent from these patients paled in comparison to the additional dollars it would make by switching their insurer.

72.     Billing usual and customary charges to insurance companies for members' treatments and services, while routinely waiving those plan members' payment responsibilities, is specifically prohibited and identified as insurance fraud by Fla. Stat. § 817.234(7)(a).

73.     As was foreseeable from the outset, ARA's scheme inflicted immediate harm on the patients the company manipulated into participation. Some patients eventually realized that private coverage under the UHC of Florida plans was less suited to their needs and circumstances than what they had received and enjoyed under their Medicaid coverage, which ARA had instructed them to abandon.

74.     On information and belief, ARA did not inform the patients it counseled into moving to private coverage of the financial differences they would experience by making that change or that their Medicaid coverage might be better suited for their circumstances.

75.     Further troubling is the fact that these patients, who were receiving insurance coverage through Medicaid at the time ARA counseled them into its scheme, would not and should not have qualified for the HIPP plan. According to AKF, HIPP funds were only available to those with no other insurance options. At all times relevant to this complaint, ARA knew or should have known that the patients for whom it arranged HIPP assistance were not eligible to receive it because they already had insurance (or were eligible for insurance) that they could afford absent the assistance. But ARA ignored that restriction altogether, repeatedly and successfully securing HIPP funds for patients with other affordable insurance options.

76.     Upon information and belief, ARA also knew that some of its patients were eligible for Medicare, and counseled patients about enrolling into Medicare as a secondary payor and then using those federal funds to cover the patients' responsibilities for coinsurance and deductibles under the commercial plans to which ARA steered the patients.

16

77.     From ARA's perspective, its scheme paid off in spades. ARA's actions resulted in patients who already had access to Medicaid and Medicare coverage being enrolled in the United plans – plans they did not need and could not afford, and allowed ARA to increase its per-dialysis-session reimbursement rate to more than twenty times the sub-$200 payments it would have received had it billed Medicaid and/or Medicare for the services it rendered.

78.     Pursuant to its scheme, ARA submitted claims to UHC of Florida seeking payment for dialysis services, and in doing so, misrepresented and failed to disclose material information regarding those services, its business practices, and the patient conversion scheme it had employed.

79.     In early 2016, UHC of Florida received several patient treatment authorization requests from in-network nephrologists attempting to refer certain UHC of Florida Gold Compass 1500 plan members to ARA facilities in Clewiston and Belle Glade, Florida. Each of the members at issue had newly enrolled in UHC of Florida's Gold Compass 1500 plan during the 2016 open enrollment period and each suffered from ESRD.

80.     Due to the remote location of Clewiston and Belle Glade, UHC of Florida determined that there were no in-network dialysis providers within 35 miles of the members' homes. Thus, in an effort to ensure that members were getting the treatment that they needed, and without knowledge of ARA's deceptive and fraudulent activity described herein, UHC of Florida authorized treatment for these members at the ARA facilities. In authorizing treatment, UHC of Florida relied on the truth, accuracy, and completeness of the information it was provided.

81.     UHC of Florida later determined that these members either were covered by Medicaid or likely could qualify for Medicaid and/or Medicare. Had UHC of Florida originally been aware of ARA's fraudulent scheme and that these patients already had Medicaid coverage, the initial treatment authorization requests would have been denied

17

and UHC of Florida would not have paid for the services ARA rendered. Indeed, given the extraordinary facts set forth herein, UHC of Florida would have coordinated with the patients' nephrologists, as well as Medicaid and Medicare officials, so that UHC of Florida's plans were never issued to these individuals in the first place.

82.     As a direct result of ARA's unlawful and fraudulent conduct, UHC of Florida made substantial benefits payments to ARA for dialysis claims that were not valid and would not have otherwise been payable.

***ARA's actions violate Florida statutes prohibiting insurance fraud, healthcare kickbacks, and patient brokering.***

83.     ARA's conduct violates Florida statutes that prohibit insurance fraud, health care kickbacks, and patient brokering.

84.     Florida statutes (Fla. Stat. § 817.234 *et seq.*) prohibit insurance fraud.

85.     Fla. Stat. § 817.234(1)(a)(1) states that a person commits insurance fraud if that person "causes to be presented any written or oral statement as part of, or in support of, a claim for payment or other benefit pursuant to an insurance policy . . . knowing that such statement contains . . . false, incomplete, or misleading information concerning any fact or thing material to such claim[.]"

86.     Fla. Stat. § 817.234(1)(a)(2) states that a person commits insurance fraud if that person "[p]repares or makes any written or oral statement that is intended to be presented to any insurer in connection with, or in support of, any claim for payment or other benefit pursuant to an insurance policy . . . knowing that such statement contains any false, incomplete, or misleading information concerning any fact or thing material to such claim[.]"

87.     Fla. Stat. § 817.234(1)(a)(3) states that a person commits insurance fraud if that person "Knowingly presents, causes to be presented, or prepares or makes with knowledge or belief that it will be presented to any insurer, . . . any false, incomplete, or misleading information or written or oral statement as part of, or in support of, an

application for the issuance of, or the rating of, any insurance policy . . . or [k]knowingly conceals information concerning any fact material to such application[.]"

88.     Finally, Fla. Stat. § 817.234(7)(a) states that "It shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge."

89.     ARA's business practices and actions described above, including its routine waiver of UHC of Florida plan members' payment responsibilities, its coordination with AKF to pay UHC of Florida plan members' premiums, and its role in presenting, preparing, and causing to be presented to UHC of Florida false, incomplete, or misleading statements or information associated with United plan members' applications for the issuance of insurance policies and subsequent insurance claims, directly violate the provisions of  Fla. Stat. § 817.234 set forth above.

90.     Florida's Anti-Kickback Statute (Fla. Stat. § 456.054) prohibits kickbacks in the health care industry. Under the statute, the term "kickback" means "a remuneration or payment, by or on behalf of a provider of health care services or items, to any person as an incentive or inducement to refer patients for past or future services or items, when the payment is not tax deductible as an ordinary and necessary expense." Fla. Stat. § 456.054(1). The statute makes it "unlawful for any health care provider or any provider of health care services to offer, pay, solicit, or receive a kickback, directly or indirectly, overtly or covertly, in cash or in kind, for referring or soliciting patients." Fla. Stat. § 456.054(2). The statute also establishes that violations of its provisions shall be considered patient brokering and shall be punishable as provided in Florida's Patient Brokering Act, Fla. Stat. § 817.505.

19

91.      ARA has repeatedly violated Florida's Anti-Kickback Statute through its actions described above, including its practice of directly or indirectly providing remuneration to and through AKF to solicit or obtain the referral of patients for whom ARA can bill UHC of Florida for out-of-network treatments or services, as well as its practice of making donations to AKF, which AKF uses to induce patients to purchase ARA's products.

92.      Florida's Patient Brokering Act (Fla. Stat. § 817.505 *et seq.*) separately prohibits "patient brokering," stating that "[i]t is unlawful for any person, including any health care provider or health care facility, to . . . [o]ffer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility[.]" Fla. Stat. § 817.505(1)(a).

93.      Fla. Stat. § 817.505(1)(b) makes it unlawful for any person to solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in return for referring patients or patronage to or from a health care provider or health care facility.

94.      Fla. Stat. § 817.505(1)(c) makes it unlawful for any person to solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility.

95.      Fla. Stat. § 817.505(1)(d) prohibits any health care provider or facility from aiding, abetting, advising, or otherwise participating in the conduct prohibited under Fla. Stat. § 817.505(a), (b), or (c).

96.      In violation of  Fla. Stat. § 817.505(1)(a), ARA has offered to pay and has paid remuneration, directly or indirectly, to induce the referral of patients or patronage by (a) agreeing to waive patients' cost-sharing obligations on the condition that patients

enroll in UHC of Florida plans and seek dialysis services from ARA and (b) using AKF to provide cash payments to patients for their insurance premiums on the condition that the patients enroll in UHC of Florida plans and seek dialysis services from ARA. ARA has orchestrated these payments to induce patronage by patients and create the opportunity to bill UHC of Florida at higher and more profitable reimbursement rates for ARA's dialysis services.

97.     In violation of Fla. Stat. § 817.505(1)(b), AKF has solicited or received remuneration in return for referring patients and patronage to ARA by accepting "donations" from ARA and then using those "donations" to pay the insurance premiums of patients who enrolled in UHC of Florida plans, effectively ensuring that these patients and their patronage was referred to ARA under circumstances that would allow ARA to extract higher and more profitable reimbursement rates from UHC of Florida. ARA has violated Fla. Stat. § 817.505(1)(d) by aiding, abetting, advising, and otherwise participating in AKF's aforementioned prohibited conduct.

98.     Finally, in violation of Fla. Stat. § 817.505(1)(c), UHC of Florida plan members have received remuneration from AKF and ARA, in the form of waived cost-sharing obligations and covered insurance premiums, in return for their agreement to switch from Medicaid to UHC of Florida plans and ultimately to seek treatment from ARA for which ARA could then bill UHC of Florida. Though UHC of Florida does not fault its plan members for accepting remuneration for expenses they could not otherwise afford, and understands that ARA manipulated these plan members into unwitting participation in ARA's illegal scheme, ARA has violated Fla. Stat. § 817.505(1)(d) by aiding, abetting, advising, and otherwise participating in this conduct.

99.     ARA's conduct also violates Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.201, as described in more detail below.

***ARA has moved ESRD patients onto United plans in Ohio by waiving patient cost-sharing responsibilities and using AKF to pay patient premiums***

100.    ARA similarly provides dialysis services to Ohio residents suffering from ESRD through the dialysis centers that it owns and operates across the State, including centers located in the cities of Warren and Youngstown.

101.    In Ohio, United offers two ACA exchange plans: (1) the Ohio Compass plan which does not have out-of-network benefits, and (2) the Ohio Navigate Plus plan which includes out-of-network benefits.

102.    Because it provides out-of-network benefits, the Ohio Navigate Plus plan requires higher premium payments from members. Consequently, as of February 2016, approximately 10,000 Ohio members were enrolled in the Ohio Compass plan, while only 500 Ohio members were enrolled in the Ohio Navigate Plus plan.

103.    Upon information and belief, ARA has implemented and continues to execute the same Medicaid-to-commercial conversion scheme in the State of Ohio as the one it implemented in the State of Florida, as is described above.

104.    As in Florida, driven by its pursuit of greater profits, ARA has deceitfully and fraudulently used its relationship with AKF to pay premiums for vulnerable ESRD patients of its Ohio clinics, convincing them to drop or move away from government insurance and enroll in the exchange plans United offers in Ohio.

105.    And, as in Florida, ARA has systematically and routinely waived those patients' coinsurance, copayment, and deductible obligations.

106.    Moreover, upon information and belief, ARA has not advised these patients of the economic burdens they assume in following ARA's direction to forego Medicaid or Medicare coverage.

107.    Pursuant to its scheme, ARA has submitted claims to UHC of Ohio and ASI seeking payment for dialysis services, and in doing so, has misrepresented and

failed to disclose material information regarding those services, its business practices, and the patient conversion scheme it had employed.

108.    As a direct result of ARA's unlawful and fraudulent conduct in Ohio, UHC of Ohio and ASI have paid significant amounts to ARA for dialysis claims that were not and would not have otherwise been owed.

***ARA's scheme does not appear to be limited to Ohio and Florida.***

109.    Recently, the California Department of Managed Health Care notified United of certain out-of-network requests that had been submitted to UnitedHealthcare Benefits Plan of California for outpatient dialysis services, and requested further information regarding the reasons the requests were submitted.

110.    United commenced an investigation and identified a number of plan members with ESRD who had started seeking dialysis treatments from an out-of-network provider called "Madera Dialysis" located in Madera, California. Some of those patients lived far from the Madera clinic where they sought dialysis services and could have received those same services from in-network dialysis providers that were located significantly closer to where they live.

111.    Madera Dialysis is also known as Madera Kidney Center LLC, and is a subsidiary of ARA.

112.    While United's investigation into this situation is in the incipient stage, it appears that ARA's efforts to push patients onto United commercial plans to maximize ARA's profits at the expense of United, the patients themselves, and (as described below) all insureds in the relevant state are not limited to Florida and Ohio.

113.    ARA also appears to have adopted new billing tactics designed to extract exorbitant payments from United. For example, since United stopped paying the "billed" charges ARA had submitted pursuant to its aforementioned scheme, ARA has

started causing unwarranted clinical "gap exception" requests to be submitted to
United in a continuing effort to get paid at the unjustified "billed" rate.

**The use of AKF to move ESRD patients onto commercial plans has deservedly come under increased government scrutiny in recent months.**

114.    AKF's role in using vulnerable patient populations to maximize the profits
of dialysis providers like ARA has drawn increased scrutiny from government agencies.

115.    Earlier this year, AKF challenged the attempts of another commercial
insurer, Blue Cross of Idaho, to protect its insureds by refusing to accept premium
payments from third parties, including from AKF and its HIPP program.

116.    In a March 17, 2016 letter responding to the challenge, Dean L. Cameron,
Director of Idaho's Department of Insurance, found that Blue Cross's decision to start
rejecting third-party payments, including AKF's HIPP payments, furthered the interests
of Blue Cross's insureds (including those who did and did not suffer from ESRD) as
well as the general public. In doing so, Director Cameron made several important
observations about the specific role AKF plays in the dialysis community.

117.    *First*, citing AKF's own annual report, Director Cameron noted that AKF's
HIPP program is funded by contributions from dialysis providers who "have a financial
interest in their patients' care," and concluded that those dialysis providers "are
indirectly paying the premium" for the patients who have secured premium assistance
from AKF.

118.    *Second*, Director Cameron pointed out that AKF's conduct directly and
negatively impacted all Idaho insureds, noting that Idaho's Department of Insurance
shared federal government's concerns about AKF payments "skewing the insurance
pool and creating an unlevel field for policies sold both on and off the exchange" and
the resulting "constant creep of increased premiums on all individuals."

119.    *Third*, Director Cameron characterized AKF's challenge as "curious" and
"interesting" because it focused on the limitations being placed on *providers*, not

24

patients. Director Cameron wrote that, "with the purported focus of AKF's concern being the patient . . . I find it interesting that AKF's focus is on the provider, not the patient."

## COUNT I
## VIOLATION OF FLORIDA'S
## DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

120.    UHC of Florida incorporates by reference paragraphs 1 – 99 above as if fully set forth herein and further alleges as follows.

121.    Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*, declares to be unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.24(1). The provisions of FDUTPA are to be liberally construed to protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts and practices in the conduct of any trade or commerce. Fla. Stat. § 501.202(2).

122.    An act is unfair under FDUTPA when it offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *See Rollins, Inc. v. Butland,* 951 So.2d 860, 869 (Fla. 2d DCA 2006). A deceptive act or practice under FDUTPA is a representation, omission, or other act or practice that is likely to mislead a consumer acting reasonably under the circumstances to the consumer's detriment. *See PNR, Inc. v. Beacon Prop. Mmgt., Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

123.    ARA is and has been engaged in trade and commerce in the State of Florida.

124.    ARA has sought to specifically harm Florida consumers in the execution of its fraudulent scheme.

125.     UHC of Florida and its plan members are consumers under FDUPTA. *See* Fla. Stat. § 501.203(7).

126.     UHC of Florida has been injured by ARA's unfair or deceptive practices in the course of buying medical services that ARA rendered unlawfully and sold in the State of Florida.

127.     ARA's business practices are unfair, deceptive, and unconscionable and constitute both *per se* and traditional violations of FDUPTA

128.     Violations of any law, statute, rule, or regulation that proscribes unfair methods of competition, or unfair, deceptive, or unconscionable acts or practices constitute *per se* violations of FDUTPA. Fla. Stat. § 501.203(3)(c).

129.     ARA has violated FDUTPA *per se* by employing business practices and taking actions (as described above) that violate statutes designed to protect public welfare, including Fla. Stat. § 817.234 (prohibiting false and fraudulent insurance claims), Fla. Stat. § 817.505 (prohibiting patient brokering), and Fla. Stat. § 456.054 (prohibiting kickbacks).

130.     ARA's unlawful actions, including its insurance fraud, kickbacks, and patient brokering, affected at least each of the claims for services rendered in Florida identified in Exhibit A (attached), and have caused significant economic harm to UHC of Florida because they have induced UHC of Florida to make substantial benefits payments to ARA that it was not obligated to make.

131.     ARA's deceptive and unfair practices, as alleged herein, also constitute traditional violations of FDUPTA.

132.     ARA has deceived and misled patients, to their detriment, into using ARA's services through false and incomplete representations about their payment responsibilities under United's plans.

133.   ARA has also deceived and misled UHC of Florida, to its detriment, by making misrepresentations and omissions in connection with claims it submitted for reimbursement, and by employing the deceptive practices described below.

134.   ARA knew or reasonably should have known that the relevant UHC of Florida plans required UHC of Florida members to pay not only their own premiums, but also a portion of the charges that ARA submitted to United in the form of copayments, deductibles, and coinsurance.

135.   Nevertheless, ARA coordinated with AKF to pay patients' premiums. ARA also adopted and implemented a fee-forgiving scheme wherein ARA billed UHC of Florida for patient charges despite agreeing to waive the portion of those charges patients were required to pay ARA. ARA engaged in this illegal conduct in exchange for those patients' agreement to enroll in a UHC of Florida plan and to seek dialysis services from ARA.

136.   ARA deceived UHC of Florida by submitting charges to UHC of Florida for services rendered to plan members without disclosing the routine waivers of cost-sharing obligations that ARA had provided to those members or the third-party premium assistance that those plan members had received.

137.   The charges ARA submitted to UHC of Florida also did not accurately reflect ARA's actual charges to UHC of Florida plan members, since ARA had waived their cost-sharing obligations.

138.   By submitting charges to UHC of Florida for payment of benefits for charges related to dialysis services, ARA also misrepresented that those services had been lawfully rendered.

139.   ARA's deceptive and unfair business practices, including its misrepresentations and omissions, described above, affected at least each of the claims for services rendered for Florida members, as identified in Exhibit A (attached), and have caused significant economic harm to UHC of Florida because they have induced

27

UHC of Florida to make substantial payments to ARA that, unbeknownst to UHC of Florida, were never owed.

140.    ARA's deceptive and unfair business practices offend public policy and have harmed UHC of Florida, UHC of Florida's plan members, and health care consumers, generally, by artificially inflating the costs of healthcare services for ARA's own pecuniary gain.

141.    UHC of Florida has retained the undersigned firm to represent it in this action and is entitled to recover its attorney's fees pursuant to the provisions of Fla. Stat. § 501.2105 and Fla. Stat. § 501.211(2).

142.    By virtue of the foregoing, and consistent with the provisions of Fla. Stat. § 501.211, UHC of Florida seeks: (a) damages for benefits paid on the unlawful and deceptive claims ARA submitted to UHC of Florida, plus attorney's fees, costs, and interest, (b) a declaratory judgment declaring that ARA's acts and practices are unfair and deceptive in violation of FDUTPA, (c) an order enjoining ARA from continuing to engage in such unfair and deceptive acts and practices, and (d) any other relief the Court deems just and proper.

**COUNT II**
**FRAUD**

143.    United incorporates by reference paragraphs 1 – 108 as if fully set forth herein and further alleges as follows.

144.    In and in connection with at least all of the claims set forth in Exhibit A, ARA knowingly made material misrepresentations and omissions to United with the intent to induce United to rely on those misrepresentations and omissions and to make benefits payments for the associated claims, as described in the paragraphs below.

145.    The charges contained in the claims submitted to United by or on behalf of ARA are material information related to United's determination of whether the claims are payable and, if so, in what amount they are to be paid.

146.    That ARA is waiving United plan members' copay, deductible, and coinsurance obligations is material information related to United's determination of whether claims submitted by or on behalf of ARA are payable and, if so, in what amount they are to be paid.

147.    That ARA is coordinating with AKF to pay plan members' insurance premiums is also material information related to United's determination of whether claims submitted by or on behalf of ARA are payable and, if so, in what amount they are to be paid.

148.    In submitting or causing to be submitted claims seeking reimbursement for services ARA provided to a United plan member, ARA represented that the charges stated in those claims were for services that were lawfully rendered.

149.    Those representations, as ARA knew at the time they were made, were false and made with the intent to induce United to make payments on the claims.

150.    The services had been rendered fraudulently and/or pursuant to intentional violations of civil and criminal statutes related to the provision of medical services and treatments, including Florida's prohibition of insurance fraud, Florida's Patient Brokering Act, Florida's Anti-Kickback Statute, and FDUTPA, as described above.

151.    Each time ARA submitted a claim seeking reimbursement for services provided to a United plan member, it effectively represented that it had collected or would make a good faith effort to collect the corresponding cost-sharing obligations from that plan member.

152.    Those representations, as ARA knew at the time they were made, were false and were made with the intent to induce United to make payments on the claims.

153.    Each time ARA submitted a claim seeking reimbursement for services provided to a United plan member, it effectively represented that it had neither paid

those members' premiums nor caused those members' premiums to be paid by an unauthorized third party.

154.    Those representations, as ARA knew at the time they were made, were false and made with the intent to induce United to make payments on the claims.

155.    ARA has had superior and special knowledge of its practice of waiving United plan members' copay, deductible, and coinsurance obligations, its practice of coordinating with AKF to pay United plan members' premiums, and its practice of rendering services fraudulently or pursuant to violations of criminal or civil statutes as described above, which is not discoverable by ordinary observation.

156.    ARA had a duty to disclose to United information material to the claims ARA was submitting for reimbursement and benefits payments, so as to not mislead United.

157.    ARA knew or should have known that its practice of waiving United plan members' copay, deductible, and coinsurance obligations, its practice of coordinating with AKF to pay United plan members' premiums, and its practice of rendering services fraudulently or pursuant to violations of criminal or civil statutes as described above should have been disclosed to United.

158.    While ARA was submitting claims seeking reimbursement for services provided to United plan members, ARA failed to disclose material information relating to its practice of waiving or failing to collect copay, deductible, and coinsurance obligations for United plan members.

159.    While ARA was submitting claims and seeking reimbursement for services provided to United plan members, ARA failed to disclose that it was coordinating with AKF to ensure that United plan members received prohibited third-party payments, contributions, or reimbursements for their insurance premiums.

160.    While ARA was submitting claims and seeking reimbursement for services provided to UHC of Florida plan members, ARA failed to disclose that the

services for which UHC of Florida was being charged had been rendered pursuant to intentional violations of civil and criminal statutes related to the provision of medical services and treatments, including, without limitation, Florida's prohibition of insurance fraud, Florida's Patient Brokering Act, Florida's Anti-Kickback Statute, and FDUTPA, as described above.

161.    ARA failed to disclose the aforementioned material information to United, despite knowing that its failure to disclose would induce United to act contrary to how it would act were it provided the material information.

162.    In failing to disclose the aforementioned material information to United, ARA acted in bad faith.

163.    ARA intended for United to rely on the aforementioned misrepresentations and omissions in order to induce United to pay benefits to ARA for dialysis services it rendered to United plan members.

164.    United reasonably relied on the aforementioned misrepresentations and omissions and made payments on the claims submitted by ARA, including those claims identified in Exhibit A attached hereto.

165.    As a direct and proximate result of ARA's misrepresentations and omissions, United has been damaged in a substantial amount to be determined at trial, exclusive of interest and costs.

166.    By virtue of the foregoing, United is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting ARA from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT III
## NEGLIGENT MISREPRESENTATION

167.    United incorporates by reference paragraphs 1 – 108 as if fully set forth herein and further alleges as follows.

168.    The charges contained in the claims submitted to United by or on behalf of ARA are material information related to United's determination of whether the claims are payable and, if so, in what amount they are to be paid.

169.    That ARA is waiving United plan members' copay, deductible, and coinsurance obligations is material information related to United's determination of whether claims submitted by or on behalf of ARA are payable and, if so, in what amount they are to be paid.

170.    That ARA is coordinating with AKF to pay plan members' insurance premiums is also material information related to United's determination of whether claims submitted by or on behalf of ARA are payable and, if so, in what amount they are to be paid.

171.    In submitting claims seeking reimbursement for services ARA provided to a United plan member, ARA misrepresented that the charges stated in those claims were for services that were lawfully rendered.

172.    ARA had a duty to not mislead United and to disclose to United information material to the claims ARA was submitting for reimbursement and benefits payments.

173.    Each time ARA submitted a claim seeking reimbursement for services provided to a United plan member, it effectively misrepresented that it had collected or would make a good faith effort to collect the corresponding cost-sharing obligations from that plan member.

174.    Each time ARA submitted a claim seeking reimbursement for services provided to a United plan member, it also effectively misrepresented that it had not paid those members' premiums or caused those members' premiums to be paid by an unauthorized third party.

175.    While ARA was submitting claims seeking reimbursement for services provided to United plan members, ARA also failed to disclose material information

relating to its practice of waiving or failing to collect copay, deductible, and coinsurance obligations for United plan members.

176.    While ARA was submitting claims and seeking reimbursement for services provided to United plan members, ARA also failed to disclose that it was coordinating with AKF to ensure that United plan members received prohibited third-party payments, contributions, or reimbursements for their insurance premiums.

177.    These omissions made what ARA represented through its submission of claims for payment materially misleading or false.

178.    ARA knew or should have known that its representations, including its representations conveyed as a result of omissions, were false, or made them without knowledge of their truth or falsity.

179.    ARA intended to induce United to act on its misrepresentations and omissions.

180.    United, acting in justifiable reliance on ARA's misrepresentations and omissions, suffered resulting injury by making payments on claims submitted by ARA.

181.    By virtue of the foregoing, United is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting ARA from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT IV
## UNJUST ENRICHMENT

182.    United incorporates by reference paragraphs 1 – 119 as if fully set forth herein and further alleges as follows.

183.    United has conferred a benefit on ARA in the form of significant payments of benefits based on claims and charges for dialysis treatments and services, and ARA has knowledge of that benefit.

184.     ARA has voluntarily accepted and retained the payments for dialysis services made to it by United.

185.     Under the circumstances of this case, as set forth in the paragraphs above, it would be inequitable for ARA to retain those payments.

186.     The money ARA has received from United belongs in equity and good conscience to United.

187.     By virtue of the foregoing, United is entitled to recover the substantial amount of benefits payments ARA has improperly retained.

## COUNT V
## TORTIOUS INTERFERENCE WITH CONTRACT

188.     United incorporates by reference paragraphs 1 – 108 as if fully set forth herein and further alleges as follows.

189.     ARA's conduct constitutes tortious interference with a contractual relationship.

190.     Each of the members for whom ARA submitted claims and received payment from United received healthcare benefits pursuant to a benefit plan insured and/or administered by United.

191.     The terms of members' benefit plans were set forth in individual medical contracts between the members and United.

192.     These contracts contained provisions that required members to satisfy their payment responsibilities (e.g. copayments, coinsurance, and/or deductibles) by making payments to providers.

193.     These contracts also contained provisions that required members to pay their premiums and prohibited members from accepting any direct or indirect contributions or reimbursements by or on behalf of any unauthorized third party for any portion of the premiums for coverage under the contracts.

194.    ARA knew or reasonably should have known that their patients' United plans required them to satisfy their payment responsibilities and pay their own premiums, without accepting contributions or reimbursements by or on behalf of any unauthorized third party such as AKF.

195.    Despite this knowledge, ARA intentionally procured the breach of members' contracts by waiving their payment responsibilities and by coordinating with AKF to pay members' premiums and/or cause members to accept unauthorized third party contributions or reimbursements for their premiums.

196.    ARA's procurement of these breaches was without justification or privilege.

197.    The breaches ARA caused have resulted in significant damages to United in the form of unnecessary payments United made to ARA subsequent to those breaches.

198.    By virtue of the foregoing, United is entitled to an award of compensatory damages, including consequential damages, together with interest and costs, an injunction prohibiting ARA from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT VI
## CIVIL CONSPIRACY TO OBTAIN FUNDS FROM UNITED

199.    United incorporates by reference paragraphs 1 – 108 and 120 – 166 as if fully set forth herein and further alleges as follows.

200.    ARA and AKF have conspired and developed a common understanding or design to do the unlawful acts described above or to do a lawful act by unlawful means.

201.    Specifically, in order to achieve the unlawful objective of fraudulently and unlawfully converting ARA patients to United's plans to fraudulently and unlawfully

obtain funds from United, ARA and AKF conspired to have AKF pay ARA's patients' premiums using "charitable donations" made by ARA to AKF.

202.    Upon information and belief, the agreed upon means for achieving that objective was use of AKF as a straw man in the making of illegal payments, by converting the donations that AKF received from ARA to premium payments for ARA patients. In substance, this was no different than ARA making those payments directly to its patients.

203.    ARA and AKF have performed numerous overt acts in furtherance of the conspiracy. Specifically, upon information and belief, (a) ARA made donations to AKF, (b) ARA submitted applications for premium assistance to AKF on behalf of ARA patients, (c) AKF approved the applications, (d) AKF paid the premiums of ARA patients to induce their patronage of ARA products and services, (e) ARA counseled and assisted in enrolling its patients in United commercial plans, and (f) ARA submitted claims for reimbursement to United.

204.    ARA and AKF performed these overt acts in pursuit of the conspiracy to convert patients to United's plans in order to extract funds from United. United publicly adheres to CMS guidance on third-party payments and, therefore, does not accept payment from entities like AKF. ARA and AKF knew this at the time they engaged in overt acts in pursuit of the conspiracy to wrongfully convert patients to United's plans in order to extract funds from United.

205.    The concerted actions of ARA and AKF have caused United to be damaged in an amount to be determined at trial.

206.    Alternatively, even if the actions taken by ARA and AKF do not constitute a separately actionable tort or other wrong, the actions still constitute an unlawful conspiracy.

207.    ARA and AKF possess a "peculiar power of coercion" by virtue of their combination, relationship, and economic influence when acting together that individual

entities acting alone in the healthcare space do not possess. See *Walters v. Blankenship*, 931 So. 2d 137, 140 (Fla. Dist. Ct. App. 5th Dist. 2006) ("an alternative basis for a civil conspiracy claim exists where the plaintiff can show some 'peculiar power of coercion' possessed by the conspirators by virtue of their combination, which an individual acting alone does not possess.'" (internal citations omitted)).

208.    ARA and AKF acted maliciously in conspiring to shift vulnerable dialysis patients off of Medicaid and onto the United plans in order to extract higher reimbursement payments from United and inflate ARA's profits.

209.    This concerted action has caused United to be damaged by making substantial amounts of payments on claims that were fraudulent and the product of unlawful, unfair, and deceptive practices.

210.    By virtue of the foregoing, United is entitled to an award of compensatory and punitive damages, together with interest and costs, an injunction prohibiting ARA from continuing to engage in the tortious conduct described above, and any other relief the Court deems just and proper.

## COUNT VII
## REQUEST FOR DECLARATORY & INJUNCTIVE RELIEF

211.    UHC of Florida incorporates by reference paragraphs 1 – 108 and 120 - 142 as if fully set forth herein and further alleges as follows.

212.    A justiciable controversy exists between UHC of Florida and ARA as to the claims and charges arising out of ARA's conduct, as described above, and which ARA submitted to UHC of Florida for the payment of benefits. ARA has declared that its scheme to increase its profits by using the forms of remuneration described herein to steer ESRD patients away from Medicaid or Medicare and onto UHC of Florida commercial plans and then submitting claims for out-of-network dialysis services is legal. UHC of Florida disagrees. United further believes that no payments of benefits

are due to ARA on any claims or charges that are pending or may be submitted in the future pursuant to ARA's scheme.

213.    There is a bona fide, present, and practical need for a declaration as to all such claims and charges.

214.    A binding adjudication of the legality of ARA's actions is proper and necessary, including but not limited to a determination about the legality of any pending or future claims or charges.

215.    FDUTPA also authorizes declaratory and injunctive relief for violations of its provisions. *See* Fla. Stat § 501.211(1).

216.    UHC of Florida is entitled to a judgment pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and FDUTPA, Fla. Stat. § 501.211(1), declaring that ARA's actions and business practices violate FDUTPA, and that any claims for payments of benefits submitted by ARA to UHC of Florida pursuant to ARA's scheme described herein are not payable and void as a matter of law and public policy. As ancillary relief thereto, UHC of Florida is also entitled to an injunction prohibiting ARA from continuing to engage in the deceptive and unlawful acts and practices described herein.

## PRAYER FOR RELIEF

WHEREFORE, United respectfully requests an award in its favor and granting the following relief:

a.    An award of both actual and consequential damages;

b.    An award of punitive damages as requested herein;

c.    Equitable relief as requested herein;

d.    Declaratory and injunctive relief as requested herein;

e.    An award of attorney's fees as requested herein;

f.    Costs of court;

g.     Prejudgment and post-judgment interest; and

h.     An award of any other relief in law or equity that the Court deems just and proper.

Dated: July 1, 2016

By: _s/Michael R. Whitt_____
Michael R. Whitt (Fla. Bar No. 0725020)
mwhitt@robinskaplan.com
Robins Kaplan LLP
711 Fifth Avenue South, Suite 201
Naples, FL 34102
T: (239) 430–7070
F: (239) 213–1970

Martin R. Lueck (*pro hac vice* to be submitted)
Thomas C. Mahlum (*pro hac vice* to be submitted)
Jeffrey S. Gleason (*pro hac vice* to be submitted)
Jamie R. Kurtz (*pro hac vice* to be submitted)
William Bornstein (*pro hac vice* to be submitted)
Robins Kaplan LLP
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402–2015
T: (612) 349–8500
F: (612) 339–4181
mlueck@robinskaplan.com
tmahlum@robinskaplan.com
jgleason@robinskaplan.com
jkurtz@robinskaplan.com
wbornstein@robinskaplan.com

*Attorneys for Plaintiffs UnitedHealthcare of Florida, Inc., UnitedHealthcare of Ohio, Inc., and All Savers Insurance Company*